# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

## HUNTINGTON DIVISION

WHITLEY HUNDLEY,

    Plaintiff,

v.                                                      CIVIL ACTION NO. 3:17-3818

AUTISM SERVICES CENTER,
INCORPORATED,

    Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Partial Motion to Dismiss. ECF No. 4. Defendant moves to dismiss Counts II and III of Plaintiff's complaint, pursuant to Federal Rule of Civil Procedure 12(b)(6). *Def.'s Partial Mot. to Dismiss*, ECF No. 4. In Count II, Plaintiff claims that Defendant tortuously interfered with her employment and prospective business advantage; and in Count III, Plaintiff claims that Defendant fired Plaintiff in violation of West Virginia public policy, constituting a retaliatory discharge. *Compl.*, ECF No. 1-1, at ¶ 56-76. The parties have fully briefed the issues and the motion is now ripe for adjudication. As explained below, the Court **GRANTS** Defendant's motion.

### I. BACKGROUND

Plaintiff, Whitley Hundley, by counsel, filed a complaint in the Circuit Court of Cabell County, West Virginia, on July 20, 2017, alleging several claims against Defendant, Autism Services Center, Inc. *See generally Compl.* Plaintiff's complaint had three claims: (1) interference with rights under the Family and Medical Leave Act; (2) tortious interference with employment

and prospective business advantage; and (3) retaliatory discharge. *Compl.*, at ¶ 41-76. On August 14, 2017, Defendant removed the case to this Court. *Def.'s Notice of Removal*, ECF 1, at 1.

Defendant operates a series of residences in the Huntington area that care for individuals with autism. *Mem. in Supp. of Def.'s Mot. to Dismiss*, ECF No. 6, at 1. Plaintiff had been an employee at one of the residences operated by Defendant. *Compl.*, at ¶ 4-6. She started working for Defendant on October 19, 2014. *Id.* at ¶ 4. After becoming pregnant, Plaintiff voluntarily left her employment with Defendant on or around January 18, 2015. *Id.* at ¶ 8-9; *Answer*, ECF No. 5, at ¶ 10. Plaintiff left her employment with Defendant on what appeared to be friendly terms. *Compl.*, at ¶ 9. After an eight-month hiatus, Plaintiff resumed her employment with Defendant on or about October 27, 2015. *Id.* at ¶ 10-11; *Answer*, at ¶ 10.

During her second period of employment with Defendant, Plaintiff discovered that her daughter had multiple serious health conditions. *Compl.*, at ¶ 12. Plaintiff notified Defendant of her daughter's illnesses, and would periodically request time off to tend to her sick daughter. *Id.* at ¶ 15-16.

Roughly a year into her second period of employment, in the late summer or early fall of 2016, Plaintiff obtained a second job working for Autism Management in Cabell County, West Virginia. *Id.* at ¶ 18. Autism Management is a competitor of Defendant. *Pl.'s Resp.*, ECF No. 8, at 1. On or about October 5, 2016, after Plaintiff had notified Defendant of her second job, Plaintiff's supervisor, an employee of Defendant, allegedly told Plaintiff that "he did not care if she had another job, [but said] that she was 'unloyal,' and that she 'needed to figure it out.'" *Compl.* at ¶ 21. Plaintiff believed these comments constituted a threat that if she maintained her second job, she would be fired. *Id.* at ¶ 22.

On November 26, 2016, Plaintiff, although not scheduled to work, was called to one of the Defendant's residences by her co-workers. *Id.* at ¶ 23. They needed Plaintiff's assistance in caring for one of Defendant's clients who was upset. *Id.* at ¶ 23-25. This particular client supposedly cooperated better with Plaintiff than he or she did with others. *Id.* Eventually, Plaintiff calmed down the client. *Id.* at ¶ 27. However, during the situation, Plaintiff, apparently, was forced to raise her voice to speak over the loud yelling of the client. *Id.* at ¶ 34-35.

While at work during her next scheduled shift on November 28, 2016, Plaintiff's supervisor called Plaintiff into her office and alleged that Plaintiff had verbally abused the agitated client two days prior. *Id.* at ¶ 28-29. The next day, Defendant terminated Plaintiff based upon the allegation of "inappropriate interaction with her client and/or verbal abuse." *Id*. at ¶ 30 (internal quotations omitted). Defendant filed a report with Adult Protective Services ("APS"), against Plaintiff, in which Defendant claimed that Plaintiff had used curse words and yelled at the agitated client. *Id.* at ¶ 32; *Answer*, at ¶ 35. As a result of Defendant's allegations regarding the incident for which she was fired, Plaintiff claims that she "struggled to find suitable gainful employment following her termination." *Compl.*, at ¶ 36.

At some point after her termination, Plaintiff's Certified Nursing Assistant ("CNA") license became due for renewal. *Id.* at ¶ 37. Plaintiff asserts that Defendant was obligated to "provide timely and accurate documentation to the Office of Health Facility Licensure & Certification," but that Defendant failed meet this obligation. *Id.* at ¶ 37-38. Further, Plaintiff alleges that as a result, her CNA license was suspended on or about February 28, 2017, pending investigation. *Id*. After an apparently brief investigation, Plaintiff's license was reinstated on March 8, 2017. *Id*. at ¶ 39. Plaintiff claims that Defendant's conduct caused her to suffer "lost

wages and other benefits of employment, emotional distress, and damage to her reputation. *Id.* at ¶ 40.

On August 21, 2017, Defendant filed a Partial Motion to Dismiss (ECF No. 4) with an accompanying Memorandum in Support of the Motion (ECF No. 6). Plaintiff responded on September 5, 2017 (ECF No. 7); and Defendant replied on September 12, 2017 (ECF No. 8).

**II. LEGAL STANDARD**

Federal Rule 8(a) requires a complaint to include "a short and plain statement of the claim … showing entitle[ment] to relief." Fed. R. Civ. P. 8(a)(2). To overcome a motion to dismiss under Federal Rule 12(b)(6), a complaint must also be plausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007). This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotations and citations omitted). A complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted). Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level …." *Twombly*, 550 U.S. at 555 (citations omitted). If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should … be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotations and citations omitted). "Although for the purposes of a motion to dismiss we must take

all of the factual allegations in the complaint as true, we are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (internal quotations and citation omitted). Finally, a court must also "draw[ ] all reasonable factual inferences from those facts [alleged] in the plaintiff's favor . . . ." *Martin v. Duffy*, 858 F.3d 239, 248 (4th Cir. 2017) (internal quotations omitted) (quoting *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (internal citations omitted)).

### III. DISCUSSION

As Defendant has moved to dismiss two of Plaintiff's claims, the Court will address each in turn.

#### A. Count II: Tortious Interference

Defendant first claims that Plaintiff has failed to state the factual basis on which a claim for tortious interference can be made. *Mem. in Supp. of Def.'s Mot. to Dismiss*, at 4. In order to establish a *prima facie* claim for tortious interference, a plaintiff must show: "(1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages." Syl. Pt. 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 314 S.E.2d 166, 167 (W. Va. 1983). If a plaintiff makes the *prima facie* showing, the defendant may "prove lawful justification or privilege for its behavior as an affirmative defense." *Id.* at 173 (internal citation omitted). Such justification includes showing a "legitimate competition between plaintiff and themselves." *Tiernan v. Charleston Area Med. Ctr., Inc.*, 506 S.E.2d 578, 592 (W. Va. 1998).

Additionally, West Virginia courts specifically recognize tortious interference claims in the context of an individual's employment relationships. *Id.* at 171-73; *Imagine Medispa, LLC v. Tranformations, Inc.*, 999 F.Supp.2d 873, 883 (S.D.W. Va. 2014) (listing West Virginia cases in

which courts have permitted tortious interference claims in the context of employment relationships).

Defendant contends that Plaintiff's failure is twofold: (1) that Plaintiff failed to allege that Defendant intentionally took any action with regard to her second-job; and (2) that Plaintiff failed to state an actual injury. *Mem. in Supp. of Def.'s Mot. to Dismiss*, at 4-5. Defendant focuses primarily upon the second of Plaintiff's supposed failures. Defendant argues that Plaintiff's complaint states only vague allegations of harm, and that she fails to provide any explanation of how a possible disruption to her CNA license caused any harmful effect on her potential job prospects. *Id.* The Court finds Defendant's arguments persuasive.

From the complaint, it is unclear to the Court on what specific course of conduct Plaintiff bases her tortious interference claim. It appears that Plaintiff claims tortious interference by Defendant premised upon two different factual predicates: (1) Defendant's filing of the APS complaint; and/or (2) Defendant's failure to meet the license reporting obligation. *Compl.*, at ¶ 36, 58, 59. Additionally, Plaintiff appears to claim at least two different relationships with which Defendant supposedly interfered: (1) Plaintiff's employment relationship with Autism Management; and (2) her prospective relationship with her "economic and wage-earning prospects." *Id.* However, regardless of the combinations available to Plaintiff under these options, Plaintiff has failed to provide the necessary information in her complaint to give rise to a "plausible claim" for tortious interference.

The basic shortcoming of Plaintiff's complaint revolves around her alleged harm. The complaint fails to define the harm caused by Defendant's supposed interference, beyond making vague assertions. In her complaint, Plaintiff provides that Defendant's report with APS resulted in her "struggl[ing] to find suitable gainful employment following her termination." *Compl.*, at ¶ 36.

This general claim of harm to employment prospects is reiterated later in the complaint. *Id.* at ¶ 59. But, at no point does Plaintiff provide that other potential employers rejected her application for employment, or that other potential employers told her not to apply. Plaintiff does not even state in her complaint that she attempted to apply to any other jobs.

Contrasting Plaintiff's complaint with cases where West Virginia courts have found *prima facie* claims for tortious interference, further highlights the complaint's glaring deficiencies. In *Garrison v. Herbert J. Thomas Memorial Hosp. Ass'n*, 438 S.E.2d 6 (W. Va. 1993), the Supreme Court of Appeals of West Virginia ("West Virginia Supreme Court") reviewed the claim of a doctor who alleged that a hospital had committed tortious interference. The doctor, Dr. Garrison, argued that Thomas Memorial Hospital, his former place of business, interfered with his expected appointment to the medical staff of a Wyoming hospital. *See Garrison*, 438 S.E.2d at 12-15. The plaintiff claimed that the interference took the form of an improper letter sent by Thomas Memorial Hospital to the president of the staff for the Wyoming hospital. *Id*. at 9, 14. As a result of that alleged interference, the doctor was denied an appointment to the Wyoming hospital. *Id.* at 9. This forced the doctor to resign from a job he had already accepted as an assistant professor at a local university and interfered with his expected relationship with the hospital. *Id.* at 9, 14. The doctor clearly laid out in his complaint: his expected business relationship; how the defendant interfered with that relationship; and what injury the interference caused him. Although the doctor may have exceeded the minimum specificity needed, the complaint in *Garrison* demonstrates the type of harm needed for a claim of tortious interference. The doctor provided that the supposed interference cost him a job with a university and a potential appointment at a hospital.

Plaintiff, in this case, has provided no concrete demonstrations of harm. She has only provided speculative assertions that lack factual underpinning. Merely stating "economic and

wage-earning prospects" does not inform this Court of a fact. This provides a conclusion couched in factual terms. Had Plaintiff's complaint recounted, for example, even one instance where a prospective employer denied her application for employment, the claim may be able to continue. Instead, Plaintiff's complaint reaches a conclusion bereft of detail.

Plaintiff also cites to expected employment relationships with "additional persons and/or businesses" that were harmed. *Compl.* at ¶ 60-61. Once again, Plaintiff provides no fact to support that "additional persons and/or businesses" existed. The only support for the proposition that these "additional persons and/or businesses" existed comes from the statement itself. Therefore, Plaintiff makes a conclusion devoid of factual support. Without the factual foundation, this Court cannot determine how or when the harm took place. Even putting these more detailed questions aside, the Court still must speculate about the most basic information: with whom did Plaintiff have the expected or existing harmed relationship(s). Unlike the doctor in *Garrison*, Plaintiff has left the Court guessing as to her harm.

Of course, it is possible that Plaintiff had an employment relationship, or reasonable expectation of one, with other people or businesses at some point. But possibility alone falls below the standard to survive a 12(b)(6) motion. *See Twombly*, 550 U.S. at 546, 555 (citations omitted).

In addition to making vague assertions about harm to nondescript prospective relationships, Plaintiff's complaint also lacks the factual predicate to claim harm to her employment relationship with her other employer. Plaintiff concludes that Defendant's interference damaged her relationship with Autism Management, the company with which she held her second-job. However, nowhere in Plaintiff's complaint does she explain that she was fired from her second-job or that her second-job was otherwise adversely affected by Defendant's alleged interference. Even in her Response to the Motion to Dismiss, Plaintiff never claimed that she was fired from

her second-job because of Defendant's actions. Plaintiff merely concludes that she suffered harm. Although the Court must make reasonable factual inferences, the Court is not empowered to simply read in facts that are not plead. To assume that she was fired from her second-job would go a step too far.

Where Plaintiff has failed to identify even the most basic facts of her harm, her claim for tortious interference does not rise "above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). Accordingly, as ordered below, the Court believes dismissal of Plaintiff's tortious interference claim is appropriate.[1]

B. **Count III: Retaliatory Discharge**

Defendant also argues that Plaintiff failed to state a claim for retaliatory discharge (also termed "wrongful discharge")[2] because she has failed to identify a substantial public policy which Defendant violated in firing her. In general, employers in West Virginia "may discharge an 'at will' employee at any time for any reason." *Herbert J. Thomas Memorial Hosp. Ass'n v. Nutter ("Thomas")*, 795 S.E.2d 530, 540 (W. Va. 2016) (citing *Kanagy v. Fiesta Salons, Inc.*, 541 S.E.2d

---

[1] In reaching this conclusion, and in subsequently granting Defendant's Partial Motion to Dismiss, the Court does not suggest that no facts exist on which Plaintiff could state a claim for tortious interference. The Court only concludes that on the face of the complaint, Plaintiff failed to include all the facts that would give rise to a "plausible claim." On a motion to dismiss, the Court is confined to the facts contained within the complaint. *See Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (discussing the Supreme Court's decisions in *Twombly* and *Iqbal* and providing that the inquiry on a motion to dismiss focuses on the factual allegations of the complaint itself); *but see Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (internal quotations and citation omitted) (explaining that although extrinsic evidence is generally not considered at 12(b)(6) stage, a court may consider some extrinsic evidence if the authenticity is not challenged and it was integral to the inquiry).

[2] West Virginia courts appear to use the terms interchangeably. *See Herbert J. Thomas Memorial Hosp. Ass'n v. Nutter ("Thomas")*, 795 S.E.2d 530, 541 (W. Va. 2016) (referring to "a cause of action for wrongful discharge," then determining whether a "retaliatory discharge has occurred"). Likewise, the Court uses the terms interchangeably in this Memorandum Opinion and Order.

616, 619 (W. Va. 2000)). However, the West Virginia Supreme Court, in *Harless v. First. Nat'l Bank in Fairmont*, 246 S.E.2d 270 (W. Va. 1978), tempered this unrestricted right of an employer to fire an employee. In *Harless*, the Court held that "where [an] employer's motivation for [a] discharge is to contravene some substantial public policy principle, then [an] employer may be liable to [an] employee for damages occasioned by this discharge." Syl. Pt. 1, *Harless*, 246 S.E.2d at 271.

Subsequent jurisprudence has further expounded upon the requirements of a *Harless* wrongful discharge claim. In *Feliciano v. 7-Eleven, Inc.*, the high court in West Virginia laid out the four elements that should be examined to determine whether the plaintiff has successfully presented a wrongful discharge claim. 559 S.E.2d 713, 723 (W. Va. 2001). A court must consider:

1. Whether a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element)[;]

2. Whether dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element)[;]

3. Whether the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element)[; and]

4. Whether the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Id.* (citing *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 375 (6th Cir. 1999)).

Defendant contends that Plaintiff has failed on the first element. *Mem. in Supp. of Def.'s Mot. to Dismiss*, at 6-8. Defendant claims that Plaintiff has not demonstrated that a substantial public policy exists to protect an employee's right to work a second-job. *Id.* at 6. Whether a substantial public policy exists is a question of law. *Thomas*, 795 S.E.2d at 541 (quoting Syl. Pt. 1, *Cordel v. Gen. Hugh Mercer Corp.*, 325 S.E.2d 111 (W. Va. 1984)). In determining the existence

of a public policy, a court must "look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. Pt. 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 424 S.E.2d 606, 607 (W. Va. 1992). Furthermore, "to be substantial, a public policy must not just be recognizable as such but must be so widely regarded as to be evident to employers and employees alike." *Feliciano*, 559 S.E.2d at 718.

Since the initial recognition of the retaliatory discharge cause of action, "West Virginia courts have proceeded with 'great caution' in applying public policy to wrongful discharge actions." *Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989). Indeed, the heightened requirement of demonstrating a "substantial public policy," as opposed to a "stated public policy," reflects the reticence of courts to recognize additional grounds on which a plaintiff can make a claim for retaliatory discharge. *See Birthisel*, 424 S.E.2d at 612 ("An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations."); *Frohnapfel v. ArclorMittal USA LLC*, 772 S.E.2d 350, 355 (W. Va. 2015) ("[W]e clarified that our use of 'substantial' to modify 'public policy' in *Harless* was expressly 'designed to exclude claims based on insubstantial considerations.'"); *Roberts v. Adkins*, 444 S.E.2d 725, 729 (W. Va. 1994) (explaining that recognition of a substantial public policy under one code section, a violation of which would give rise to a wrongful discharge claim, "is in no way intended to unlock a Pandora's box of litigation in the wrongful discharge arena"); *Washington*, 870 F.2d at 962-63 (citing *Yoho v. Triangle PWC, Inc.*, 336 S.E.2d 204, 209 (W. Va. 1985)). With an eye to that cautionary approach, this Court agrees with Defendant that Plaintiff has not identified a substantial public policy on which a retaliatory discharge claim can be maintained.

Plaintiff bases her retaliatory discharge claim upon the right of employee to "practice her trade and pursue employment." *Pl.'s Resp.*, at 6. This right, she argues, protected her second-job with Defendant's competitor. *Id.* at 7. Plaintiff claims that the protected right emanates from Article III, §1 of the West Virginia Constitution. *Compl.* at ¶ 64. That section of the West Virginia Constitution protects the inherent right of persons to pursue happiness. *Id.* at ¶ 65; *see also* W. Va. Consti. Art. III, § 1. Plaintiff urges this Court to find that the West Virginia Constitution's protection for "pursuing happiness" creates a substantial public policy in favor of an employee's right to maintain a second-job. This request simply exceeds the defined boundaries that West Virginia courts have drawn in recognizing substantial public policies.

This Court dealt with a similar request by a plaintiff in *Wiley v. Asplundh Tree Expert Co.*, 4 F.Supp.3d 840 (S.D.W. Va. 2014) (Johnston, J.). In *Wiley*, the plaintiff asked this Court to recognize a substantial public policy emanating from Article III, § 17 of the West Virginia Constitution. That section of the Constitution guarantees a right to access the Courts of West Virginia. *See* W. Va. Consti. Art. III, § 17; *see also McClung v. Marion Cty. Comm'n*, 360 S.E.2d 221, 226 & n.6 (W. Va. 1987). The plaintiff contended that when the employer fired him for filing a suit to recover wages he was due under Federal and State law, the employer discharged him in violation of a substantial public policy. By firing the plaintiff for filing a lawsuit for wages he was allegedly due under labor laws, the employer supposedly contravened the substantial public policy created by Art. III, § 17 in favor of injured person's right to access the courts.

The Court in *Wiley* found that Art. III, § 17 of the West Virginia Constitution did not create a substantial public policy that could animate a claim for wrongful discharge. *Wiley*, 4 F.Supp.3d at 847. In addition to generally referencing the restraint with which West Virginia courts have proceeding in this area, the Court explained that the West Virginia Supreme Court "has been

reluctant in the case of a private employee to find a cause of action for retaliatory discharge based on a public policy emanating from" either the West Virginia or the United States Constitution. *Id.* at 846 (internal quotations omitted) (citing 105 W. Va. L.Rev. 827 (2003)). The Court analyzed West Virginia jurisprudence on the recognition of substantial public policy stemming from the State's Constitution. *Id*. at 846-74. The case law demonstrated that although a wrongful discharge claim could be based upon a public policy emanating from a provision of the state constitution, the West Virginia Supreme Court hesitated to recognize that claim "[i]n the absence of a statute expressly imposing" that public policy. *Id*. at 847 (citing *Tiernan v. Charleston Area Med. Ctr.*, 506 S.E.2d 578, 591 (W. Va. 1998)).

Likewise, in this case, Plaintiff has not evidenced a statute that supports her claim that a substantial public policy exists to protect an individual's right to have a second-job. The position of West Virginia courts has not changed since this Court decided *Wiley*. The West Virginia courts are still reluctant to recognize a substantial public policy originating in a constitutional provision without a legislative statute, for the purposes of a wrong discharge claim. *See Tiernan*, 506 S.E.2d at 591; *Swears v. R.M. Roach & Sons, Inc.*, 696 S.E.2d 1, 6-7 (W. Va. 2010) (citing positively the preference for legislative action in recognizing a substantial public policy). This Court continues to defer to the state courts on the recognition of substantial public policy under West Virginia law. *See Washington*, 870 F.2d at 962 (explaining that "[f]ederal courts are permitted . . . to rule upon state law as it presently exists and not to surmise or suggest its expansion").

Plaintiff begins her response argument by asserting that *Wiley* is not dispositive. *Pl.'s Resp.*, at 6. The Court agrees. However, the analysis in that case serves as a relevant and applicable guide for how the Court should handle this case. Indeed, as this Court did in *Wiley*, the Court again refuses to stretch the *Harless* exception too far afield.

Arguably, the plaintiff's claim in *Wiley* stood on stronger footing than Plaintiff's claim here. In *Wiley*, the constitutional section, on its face, sought to protect an individual's right to access the courts when attempting to remedy some wrong. That is, the constitutional provision clearly reflected the protected right that the plaintiff claimed the employer violated. But, in this case, Plaintiff reads a right to pursue a second-job from a provision that merely seeks to protect the right of persons to pursue happiness. Given that West Virginia courts have sown a trail from *Harless* with an abundance of caution, this Court cannot leap ahead by reading a specifically defined right from an expansive constitutional phrase. This would work contrary to the clear guidelines established by the State's courts for identifying substantial public policies for wrongful discharge actions. *See* Syl. Pt. 3, *Birthisel*, 424 S.E.2d at 607 ("Inherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person."). This type of recognition may be appropriate in other circumstances, but expansive readings of the State's Constitution in wrongful discharge actions have largely been foreclosed.

Plaintiff in her Response also contends that the ability to have a second-job is protected by the Privileges and Immunities Clause of the United States Constitution ("P&I Clause"). Plaintiff contends that the P&I Clause "guarantees citizens the right to pursue gainful employment." *Pl.'s Resp.*, at 7. As such, Plaintiff argues that the P&I Clause establishes a substantial public policy capable of animating a wrongful discharge action. The Court finds this line of argument unpersuasive. Although Plaintiff is correct that the P&I Clause protects an individual's right to practice a trade or profession, *Toomer v. Witsell*, 334 U.S. 385, 403 (1948), Plaintiff has left out the vitally important context of the P&I Clause.

That pursuing one's trade or profession is a fundamental right under the P&I Clause does not establish a substantial public policy protecting an employee's ability to maintain a second-job.

The overarching purpose of the P&I Clause is to place "the citizens of each State upon the same footing with citizens of other States." *Lunding v. N.Y. Tax Appeals Tribunal*, 522 U.S. 287, 296 (1998) (internal quotations and citation omitted); *see also* U.S. Const. art. IV, § 2, cl. 1. Thus, the P&I Clause operates to prevent States from discriminating against the citizens of other States. *Saenz v. Roe*, 529 U.S. 489, 502 (1999) ("It provides important protections for nonresidents who enter a State . . . to obtain employment."). Even the most tortured reading of the facts in this case could not raise the concerns addressed by the P&I Clause. At the most pedestrian level, Plaintiff does not allege that Defendant discriminated against, or fired, her because of her citizenship. Therefore, the fundamental rights under the P&I Clause do not establish a substantial public policy for Plaintiff's wrongful discharge action.

This Court has already demonstrated that fundamental rights under the P&I Clause will not necessarily constitute substantial public policies for retaliatory discharges. Among the fundamental rights protected under the P&I Clause is the right to access the courts. *See McBurney v. Young*, 667 F.3d 454, 463 (4th Cir. 2012) (internal quotations and citations omitted); *see also Canadian N. Ry. Co. v. Eggen*, 252 U.S. 553, 562 (1920). However, in *Wiley*, this Court did not recognize a substantial public policy for an injured person's right to access the courts, in the context of a wrongful discharge claim. *Wiley*, 4 F.Supp.3d at 847. To date, no West Virginia courts have disagreed with the conclusion in *Wiley*. That access to the courts is a fundamental right under the P&I Clause, but has not been recognized as a substantial public policy for wrongful discharge actions, further demonstrates that Plaintiff's argument should be rejected.

Finally, Plaintiff contends that West Virginia common law helps to establish that there is a substantial public policy protecting a person's second-job. Plaintiff cites *Torbett v. Wheeling Dollar Sav. & Trust Co* as support for this claim. This is the same case noted in the section above,

discussing tortious interference. Plaintiff claims that the West Virginia Supreme Court's recognition of tortious interference with employment relationships in *Torbett* substantiates a substantial public policy for this wrongful discharge action. As with Plaintiff's other contentions, the Court declines the opportunity to extend the limited areas of substantial public policy in retaliatory discharge suits.

Plaintiff's argument that *Torbett* establishes a substantial public policy strikes the Court as an attempt to take two bites of the same apple. Plaintiff has already claimed that Defendant tortuously interfered with her other employment relationship(s). Allowing that same claim to be made again, albeit under the label of a different cause of action, would undercut the purpose of the *Harless* exception that created a claim for wrongful discharge. *See Harless v. First Nat. Bank in Fairmont ("Harless II")*, 289 S.E.2d 692, 693, 696-97 (W. Va. 1982) (finding duplicitous the claim for the tort of outrageous conduct and the claim for retaliatory discharge, and citing the general rule "there can only be one recovery of damages for one injury"). Accordingly, the Court rejects Plaintiff's position.

Therefore, the Court finds that Plaintiff has failed to establish a substantial public policy. As Plaintiff failed the first element of a *Harless* wrongful discharge claim, dismissal of Plaintiff's claim is appropriate.

### IV. CONCLUSION

Based upon the foregoing, the Court **GRANTS** Defendant's Partial Motion to Dismiss (ECF No. 4). Counts II and III of Plaintiff's complaint are **DISMISSED WITHOUT PREJUDICE**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: October 12, 2017

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE